**ATKINSON LAW ASSOCIATES LTD.**
Robert E. Atkinson, Esq. #9958
Email: robert@nv-lawfirm.com
376 E Warm Springs Rd Suite 130
Las Vegas, NV 89119
Telephone: (702) 614-0600
*[Proposed] Local Counsel for the Debtor*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>SPLASH NEWS & PICTURE AGENCY, LLC<br><br>Debtor. | Case No. 21-11377-abl<br>Chapter 11 |

### OMNIBUS DECLARATION OF EMMA CURZON

I, Emma Curzon make the following declaration under penalty of perjury:

1. My name is Emma Curzon. I am over 21 years of age, and I am competent to testify to the matters herein.

2. I am the President of Splash News and Picture Agency, LLC ("Splash" or "Debtor"). I have served in this capacity since approximately October 2018.

3. In my capacity as President of Splash, I am responsible for, among other things:

    a. For all aspects of Splash's day-to-day operations and finances;

    b. Exercising authority over staff with the authority to hire, terminate, and change the compensation and benefits of employees;

    c. facilitating the involvement of outside consultants and professionals;

    d. analyzing historical financial performance;

    e. evaluating Splash's current liquidity situation and quantify any near-term funding requirements;

    f. preparing budgets for Splash's ongoing operations;

    g. analyzing any and all restructuring options for Splash; and

    h. Lead restructuring arrangements and manage Splash's negotiations with its creditors, all subject to member approval of Splash.

4. I am familiar with Splash's day-to-day operations, business and financial affairs.

5. I have over 18 years of experience in Finance. I hold a business degree and I am an Associate of the Chartered Institute of Management Accountants. Prior to joining Splash, I spent over 15 years managing finance functions. My previous experience also includes oversight of contracting, staffing, credentialing, and budgeting functions, among other duties.

6. I submit this declaration (the "Declaration") to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of this Chapter 11 case and in support of: (i) Splash's petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"); and (ii) the relief, in the form of motions and applications, that Splash has requested of the Court (collectively, the "First Day Pleadings").

7. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with members of the Splash, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning Splash's operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Splash.

8. This Declaration is intended to provide a summary overview of Splash and this Chapter 11 case. This Declaration provides an overview of Splash's business, organizational structure, capital structure, and the circumstances giving rise to the commencement of this Chapter 11 case. This Declaration also provides an overview of the relief requested in the First Day Pleadings.

***Splash's Business, Background Information and Organizational Structure***

9. Splash is an entertainment news and photography agency that acts as a distributor in the United States and Canada of photographic and video content for print, online and/or broadcast media.

10. Splash's business model is straightforward. Splash serves as the distributor in the United States for SSCP One Ltd ("SSCP") which is a United Kingdom entity based in the United Kingdom.

11. Prior to March 2021 the distribution agreement was with Black Country Rock Limited f/k/a Splash News and Picture Group Ltd. ("Black Country"). Black Country entered into administration (akin to a Chapter 11 proceeding) in the United Kingdom in early March 2021 and, following the filing of its administration, sold its intellectual property and associated distribution agreements to SSCP.

12. Splash is a Nevada limited liability company. Splash is 100% wholly owned by Splash News and Picture Agency Holdings, Inc. ("INC") which is a Delaware holding company. INC, in turn, is wholly-owned by Black Country.

13. As the U.S. distributor for SSCP, Splash has access to the digital library of SSCP and is authorized to distribute that content in the United States and Canada. In exchange for services as a distributor, Splash retains approximately 25% of the revenues derived from the U.S. and Canadian distributions.

14. The only personal property that Splash owns are a few pieces of miscellaneous office furniture and a few laptops that are approximately 4-5 years old. As a practical matter, Splash believes that the personal property is only worth scrap value given its age and scattered condition.

15. Splash does not own any real estate.

16. Splash has just eight (8) employees. With the exception of the one employee who uses a small, rented WeWork space in Miami, Florida,[1] the employees all work virtually from their homes at various locations in the United States. Prior to the COVID-19 pandemic the business operated from leased premises in Los Angeles.

17. Some of Splash's employees are also photographers. The rights to photographs generated by the photographers are assigned to SSCP on a cost basis and the royalties are reimbursed by SSCP. Staff photographers are compensated for their royalties through the ADP payroll at the end of each calendar month. Royalties are paid 60 days in arrears. Staff photographer royalty rates are circa 20% of sales value.

18. Because its employees work remotely, Splash does not have any traditional utility providers.

19. Splash subscribes to a few news and other information outlets that help it further gather information needed to run its operations.

*Financial Performance, Capital Structure and Overview*

20. Splash is a calendar year, cash basis entity.

21. Splash's financial performance has been affected by the two pending lawsuits referred to in points 46 and 47 of this declaration. The claims are disputed but unfortunately ongoing attorney bills have drained, and continue to drain, cash from the business. Splash is unable to continue with the financial burden to defend these claims.

22. Splash has one secured creditor, Deasil Limited ("Deasil"), which has a blanket lien in substantially all of Splash's assets. Splash has guaranteed the indebtedness owed by Black Country to Deasil. Deasil is currently owed principal and accrued interest totaling approximately £700,000 (which is approximately $972,000 USD).

*Employee Wages, Payroll Taxes and Benefits*

23. As noted above, Splash has just eight (8) employees. Splash uses ADP TotalSource, Inc. ("ADP") to handle all of its employee compensation and benefits related matters including medical, dental and vision insurance, 401(k) plan, etc.

24. Splash's employees are paid on the 15th and last calendar days of each month. Splash transmits funds to ADP approximately three business days before the due date.

---

[1] That office lease includes the furniture and utilities associated with that location. That office is used by a non-management employee who prefers to work in an office location rather than from home.

25. The average amount of funds transmitted to ADP per pay period is approximately $30,000 to $50,000 depending on whether any of the employees are receiving royalties based on prior works they licensed to Splash.

26. Splash is current on all state and federal employee withholding taxes.

27. Splash is also current on all other employee related obligations, including full payment of all payroll as of the last payroll date.

28. Additionally, Splash customarily reimburses employees who incur a variety of business expenses in the ordinary course of Splash's operations. Because these employees do not always submit their claims for reimbursement promptly, it is difficult for Splash to determine the amount outstanding at any particular time, but, based on prior experience, the amount should be approximately $500 to $5000.

29. Splash also provides paid vacation, sick-leave and personal time-off (collectively "PTO") in accordance with its employee policie.

30. Rather than monetize such unpaid sums, Splash proposes honoring PTO requests in the ordinary course of business such that an employee who decides to take a day off or take a vacation may continue to do so provided it is scheduled in accordance with ordinary and customary practices for requesting PTO. As such, Splash does not expect to have any significant expenditures relating to PTO.

31. Failure to pay employees their compensation would jeopardize Splash's Chapter 11 proceeding and its intended Plan by seriously undermining employee morale and by posing a serious risk of the loss of valuable employees.

32. Splash's ability to preserve the value of its business as a going concern to be sold through the proposed Chapter 11 Plan of Liquidation will be adversely affected if Splash is unable to retain the services of a dedicated and loyal employee group. Accordingly, it is essential that the undue hardships that employees may suffer as a consequence of the Chapter 11 filing are minimized and that morale is maintained.

33. As a result of this Chapter 11 filing, Splash is prohibited from paying claims that arose before the Petition Date unless Splash receives specific Court authorization. Amounts owed to the employees with respect to the period before the bankruptcy filings are claims with respect to which such prohibition applies.

34. To avoid the hardship that Splash's employees may otherwise suffer and maintain morale, Splash seek authority to satisfy and pay any pre-petition employee claims. Splash also requests authority to pay any related deductions and payroll tax withholdings. In addition, Splash seeks authorization to continue all of its present employee benefit plans as administered through ADP as noted above. Certain of those amounts may overlap from pre-petition to post- petition and Splash also seeks authority to pay these limited pre-petition employee claims to and on behalf of the employees whenever such payment obligations fall due.

35. Furthermore, as has been Splash's practices, to the extent deductions were made from the employee's wages and salaries prior to the petition date, Splash proposes to continue such pre-petition arrangements. Splash seeks authorization to apply or deliver such deducted sums which represent property of the employees for such purposes as contributions to insurance programs and savings plans, government and child support withholdings, in accordance with the employees' prior requests and instructions and Splash's standard ordinary practices.

36. All amounts proposed to be paid to employees for pre-petition wages and benefits are less than the $13,650 limitation per individual pursuant to § 507 of the Bankruptcy Code.

### *Existing Bank Account and Cash Management*

37. Splash has a single bank account at Citizens Bank which is located in Massachusetts.

38. Splash has a single PayPal account which it uses to transfer funds as needed.

39. Splash also uses TransferWise to the extent it needs to transmit funds internationally. TransferWise provides this service less expensively than traditional banks.

40. Splash's primary source of funds is from its work as an agent for SSCP as a distributor as detailed above.

41. Splash anticipates receiving in the coming weeks various monies from third-parties in which Splash has no legal interest. Splash anticipates that those funds will be sent via wire transfer or ACH to Splash's bank account at Citizens Bank.

42. Closure of the Citizens Bank account would result significantly inhibit SSCP from collecting monies owed to it by third-parties who continue to use Splash as a conduit for the payments.

43. To prevent the possibility of the payment of obligations incurred by Splash prior to the Petition Date, Splash will instruct Citizens Bank to refuse to honor any check or disbursement drawn on that account (with the exception of payroll related expenses and any other transaction that the Court may authorize) by providing a "stop payment" request for checks so designated by Splash.

44. However, Splash desires to keep the Citizens Bank account open to receive deposits as they are made. Additionally, Splash seeks authority to maintain its accounts with PayPal and TransferWise to facilitate payment of (a) ordinary course post-petition payments and expenses and (b) any additional transfers that the Court may authorize.

### *Events Leading to the Chapter 11 Cases*

45. Splash's financial problems stem from three sources. As a consequence of the global pandemic the availability of celebrity images has declined and budgets within media companies have been cut to reflect wider macro-economic challenges. This situation has been

exacerbated by two ongoing litigation cases and the costs of defending these cases. These cases are in the United Kingdom and United States.

46. The plaintiffs in the United Kingdom litigation (which is pending in the High Court of Justice, Queens Bench Division in the United Kingdom, Case No. QB-2020-001195) are seeking various forms of injunctive relief. The case involves free speech related issues under United Kingdom law and, unfortunately, has proven to be too unbearably expensive for Splash to continue its defense. Furthermore, if the plaintiffs were to prevail in that case it would likely result in a large attorney fee award against Splash. Notwithstanding the merits of the case the company has sought to settle this matter but has been unable to agree a financial settlement within its resources.

47. The second litigation is an employment related lawsuit that was originally filed in California state court by a former Splash employee and later removed to the United States District Court for the Central District of California where it is current pending as Case No. 20-CV-07131. Although Splash has insurance coverage for this litigation through Zurich American Insurance Company, the policy has a self-insured retention amount of $100,000 plus an additional $100,000 defense costs. Unfortunately, Splash's tight financial situation makes it unable to pay the self-insured retention amount in the case of liability. The attorney defense fees have also proven to be financially burdensome for Splash.

48. In June 2020, Deasil informed Splash of defaults that had occurred in the underlying loan documents in connection with the indebtedness Splash had guaranteed. The defaults were not cured and in January 2021 Deasil accelerated all indebtedness owed and made demand on Splash for payment in full.

49. Based on Splash's communications with Deasil, Splash understands that a major issue that Deasil has with Splash is the financial drain of resources caused by the on-going litigation.

50. Deasil provided Splash with a reasonable period of time to see if the resolution with the litigants could be reached. Unfortunately, the litigants were not willing to compromise. That unwillingness also meant Splash was unable to reach a satisfactory repayment plan with Deasil which, in turn, has forced Splash to seek the protections afforded by the Bankruptcy Code so that it may preserve its on-going business.

*Proposed Use of Cash Collateral*

51. At this time, Splash anticipates that, short term, it will have sufficient available sources of working capital to carry on the operation of its business post-petition through the use of cash collateral without the need for a DIP credit facility on a first-day basis. Use of cash collateral to preserve Splash's relationships with employees, vendors and suppliers and to otherwise finance their operations is essential to Splash's continued viability as it seeks to sell its business as a going-concern through its proposed Plan of Liquidation.

52. Splash has negotiated a proposed agreed order for the use of cash collateral with Deasil

53. In the absence of an order granting the use of cash collateral, serious and irreparable harm to Splash and its estate will occur.

54. As adequate protection to Deasil, Splash will agree to grant to Deasil replacement liens in all of Splash's collateral to the same extent, validity, and priority that existed as of the petition date as well as any other assets that Splash may obtain post-petition.

55. Splash shall not use cash collateral to pay prepetition interest or principal on any existing indebtedness other than as ordered by the Court.

56. Without the use of cash collateral Splash would be unable to continue to operate its businesses and Splash's estate would be irreparably harmed and the interests of Splash's pre-petition lender would be irreparably diminished as the value of the collateral would be substantially and materially reduced.

57. Pending the final hearing on use of cash collateral, Splash needs authorization on an interim basis to use sufficient cash collateral to avoid immediate and irreparable harm to the bankruptcy estate.

58. Splash is requesting that it be authorized to immediately use cash collateral to the extent necessary to avoid immediate and irreparable harm to the estate pending an emergency hearing on use of cash collateral.

*Anticipated Receipt of Non-Estate Funds*

59. A Notice of Appointment of Administrator for Black Country was sealed by the High Court of Justice of England and Wales on March 2, 2021 thereby putting Black Country into a U.K. administration proceeding (Court reference no. CR 2021-000388). That proceeding is the equivalent of a Chapter 11 proceeding in the United States.

60. Splash previously licensed intellectual property (primarily still images) to various third-parties located outside of North America. These third-parties, in turn, would pay royalty fees to Splash who, in turn, would pay the corresponding photographers monies owed to them for the licensing of their work. Stated differently, Splash effectively acted as an intermediary facilitating the licensing of photographs between photographers and third-parties, primarily news and media outlets for a fee.

61. In 2020, Black Country desired to acquire from Splash intellectual property, agency agreements with free-lance photographers and related assets. To ensure that fair valuation was provided for the assets, Splash obtained an independent, third-party appraisal from Metis Partners who valued the intellectual property between £460,000 and £571,000.

62. Based on that valuation, Splash negotiated the sale of its assets to Black Country for £1,400,000 which transaction was completed through an Assignment that occurred on January 19, 2021. As part of that transaction, Splash used 100% of the sale proceeds to pay down indebtedness owed by Splash to its lone secured creditor, Deasil.

63. Following the consummation of the intellectual property assignment, Black Country (and later SSCP following the sale of the assets from Black Country to SSCP) continued doing business with various entities outside of North America who obtain licensing rights of SSCP's intellectual property (primarily still images). Some of these entities pay monies in advance for use of images in SSCP's collection.

64. SSCP has worked with its customers to insure that accounts receivable generated after January 19, 2021 are paid directly to SSCP. Unfortunately, not all of the accounting issues have been resolved yet.

65. For example, one of Splash's former customers is based in China. The agreement between it and Splash is in Splash's name. Although Splash assigned that agreement to Black Country in January 2021 which, in turn, was assigned to SSCP in early March 2021, regulatory and accounting practices in China make it extremely difficult for SSCP to coordinate with the Chinese company to update its records to reflect SSCP as the proper licensor. As a result, the Chinese company's accounting records still reflect Splash as the contracting party and the Chinese company will only pay invoices issued under Splash's name.

66. Splash recognizes and concedes that it has no right to any royalties generated on and after January 19, 2021. To work around these challenges, Splash anticipates issuing an invoice to the Chinese company for the April 2021 pre-payment. Splash anticipates that the Chinese company will make the payment as required. Splash, in turn, anticipates then forwarding these funds to their rightful owner—SSCP .

67. As a result of these circumstances, Splash anticipates that it will receive in the coming weeks certain monies which these third-party licensees owe to SSCP (as licensor of the intellectual property) (hereinafter the "<u>Non-Estate Funds</u>").

68. Splash has no legal right or interest in those funds that are anticipated to be received as they represent monies owed by licensees to the licensor (SSCP) for content licensed by SSCP (or its predecessor Black Country) on and after the January 19, 2021 assignment.

69. Because Splash has no legal right or interest in those funds, Splash believes it must simply remit and/or forward 100% of such funds to SSCP once they are received.

70. Furthermore, if Splash were to attempt to keep or retain any portion of such funds, it would be subject to violating applicable United Kingdom insolvency law which safeguards Black Country's assets which it has in turn sold with good title to SSCP (akin to the protections afforded to United States debtors regarding property of the estate and the automatic stay).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: March <u>23</u>, 2021.

_____
Emma Curzon
President